UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

COLBY PRIOR,

    *Plaintiff,*

    *v.*

GLASS AMERICA MIDWEST, LLC,

    *Defendant.*

Civil No. 3:21cv795 (JBA)

August 24, 2023

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Glass America Midwest, LLC ("Glass America") moves [Doc. # 36] for summary judgment on all claims alleged by Plaintiff Colby Prior under the Connecticut Fair Employment Practices Act, which include the following claims: (1) sex harassment/hostile work environment in violation of C.G.S. §46a-60(b)(8); (2) quid pro quo sex harassment in violation of C.G.S. §46a60(b)(8); (3) retaliation in violation of C.G.S. §46a-60(b)(4); and (4) gender discrimination in violation of C.G.S. §46a-60(b)(1).

I.    **Background**

Plaintiff Colby Prior worked for Defendant Glass America, Midwest LLC as an Account Manager for six months beginning on July 16, 2018. (Def.'s Local Rule 56(a)(1) Statement of Facts ("SOF") [Doc. # 38] at ¶ 1.) Glass America provides automobile glass repair and replacement services. (Def.'s Ex. 1, Wakefield Decl. [Doc. # 38-1] ¶ 2.) Plaintiff's job was to drive around the Defendant's Fairfield County sales territory, meet with agents, and sell automobile glass. (*Id.* ¶ 12.)

A.    **Interactions with Don Perillo**

Prior's territory had previously been part of the territory of another employee, Don Perillo, who would go on sales calls with Prior four days a week after she was hired. (*Id.* ¶ 14.) Perillo played a significant role in training Prior, explaining to her how to set up

1

appointments, meet with agents, schedule her day, and track sales. (*Id.*) Prior agrees that Perillo trained her well, and gave her good feedback. (*Id.* ¶ 16.) Beginning in October 2018, Prior began to mostly go on sales calls by herself, though she still went on calls with Perillo two or three days a week. (*Id.* ¶ 17.)

Prior's direct supervisor was Regional Vice President of Sales John Wakefield. (*Id.* ¶ 18.) She talked to Wakefield in-person only two to three times, and had only spoken to him over the phone less than ten times prior to December 2018. (Pl. Dep. Tr. [Doc. # 41-4]. at 33-35.) Prior testified that while she knew Wakefield was her supervisor, it "felt like" Perillo was her supervisor because Perillo was Wakefield's "eyes and ears," and Perillo told her he would report to Wakefield on Plaintiff's job performance. (*Id.* at 63, 92-94.)

Beginning in September of 2018, Perillo began attempting to initiate a sexual relationship with Plaintiff. (*Id.* at 47.) The first instance occurred when the two were in a parked car, and Perillo said "I just really want to kiss you right now," which Plaintiff found "a little bit alarming." (*Id.* at 47-48.) Subsequently, Plaintiff testifies that Perillo kissed her without her consent four to five times, as well as pinching her leg and rear end, which hurt. (*Id.* at 51-59.) Plaintiff testifies that Perillo would attempt to discuss his marriage with Plaintiff, tried to get Plaintiff to spend time with him outside of work, and stated he sought a "friends with benefits" relationship. (*Id.* at 57-58, 75-76.) At some point, Plaintiff testifies that when Perillo tried to kiss her she turned her head, and Perillo said in effect "no kiss tonight." (*Id.* at 66-67.) Plaintiff reports that after this rebuff, Perillo was "not the same." (*Id.* at 67.) She reports he began not answering her work-related inquiries, that he became very short with her, and he said, "I don't know what I can tell John [Wakefield] now regarding your performance." (*Id.* at 69.) Plaintiff also states that her work relationship with Perillo deteriorated after she told

him she was not the right person to be talking to him about his marital problems. (*Id.* at 70-71.)[1]

### B.   Complaint Against Perillo

On December 14, 2018, Plaintiff reported Perillo's behavior to Human Resources (HR). (SOF ¶ 25.) This was the first time she reported Perillo's behavior to anyone at the company. (*Id.* ¶ 23.) HR Manager Lisa Christiansen investigated Prior's complaint starting the day it was filed. (*Id.* ¶ 25.) She called and left a message for Prior that day (Friday), and they spoke when Prior returned her call the following Monday, December 17. (*Id.* ¶¶ 26-27.) Christiansen spoke with Perillo on December 18, and Perillo denied Prior's allegations, but Christiansen nevertheless told Perillo not to work anymore with Prior. (*Id.* ¶ 28.) Christiansen informed Prior on December 18 that Perillo was not to have any contact with her going forward and that if he tried to contact Prior she should inform HR. (*Id.* ¶ 30.) After Prior complained to HR on December 14, she never saw or communicated with Perillo again. (*Id.* ¶ 31.) Prior was happy with Defendant's resolution of her complaint. (*Id.* ¶ 32.)

### C.   Employee Handbook

Before Plaintiff began working for Glass America, she received and read a copy of the company's Employee Handbook ("Employee Handbook", Ex. 4 to Pl.'s Obj. to SOF [Doc. # 38-4]), a copy of which she retained throughout her employment. (SOF ¶¶ 3-4.) The handbook prohibits all forms of unlawful harassment, including sexual harassment, and says employees should report harassment immediately. (SOF ¶¶ 7-9.) The handbook also states the following regarding job expectations: "You must be present and ready to work at the start

---

[1] The record is imprecise as to whether Perillo's change in behavior first occurred Plaintiff occurred after Plaintiff turned away from his attempted kiss, or whether it occurred after Plaintiff declined to discuss Perillo's marriage, though it appears from Plaintiff's testimony that both incidents played a role.

time designated by your supervisor. You must be present at work for the full duration of your shift except for your meal break unless your immediate supervisor has excused you. You are responsible for being aware of your work schedule at all times." (SOF ¶ 11, Employee Handbook at 20 § 11.1.)

The Handbook also describes the "Normal Disciplinary Process" for "non-serious" violations of policy as involving progressive steps: first a verbal warning, then a written warning, then an unpaid suspension or termination. (Employee Handbook at 22 § 10.2.) That section also states that the progressive disciplinary procedure is not mandatory, stating: "We do not guarantee that one form of action will necessarily precede another. We may take any disciplinary action (including discharge) immediately if circumstances warrant such action. Furthermore, because all employees are employed on an at-will basis, we may end the employment relationship at any time with or without a reason." (*Id.*)

### D.     Job Performance Dispute and Termination

In December 2018, Prior began having weekly calls with John Wakefield to discuss contacts and meetings, in which Wakefield would provide Prior with sales strategies. (SOF. ¶ 33.) Wakefield told Prior she was expected to make 13-15 sales calls per day. (*Id.* ¶ 34.) In his declaration, Wakefield states that he told Prior "she should be at her first call each day by 9:00 am to 9: 15 am, she should make her last call at 4:30 pm, and she must enter all of her calls in the CallProof [data entry] program." (Wakefield Decl. ¶6.) Defendant provides call logs, which Wakefield declares indicate that the average time of Prior's first sales call was 11:16 am, the average time of her last sales call was 3:55, and the average number of calls per day was 9.8. (*Id*. ¶ 8; Ex. 9.) Wakefield maintains that Prior gave a series of excuses for her lack of timeliness, including blaming her cell phone, her car, the CallProof program, traffic, her printer, and her cat's death. (*Id.* ¶ 9.) Plaintiff denies that Wakefield ever gave her negative job performance feedback (Pl. Dep. Tr. at 138, 141-43, 166-68) and maintains she was only given positive feedback. (*Id.* at 30-31.) She had issues using the CallProof data entry

4

software, and when she worked with Perillo they did not use CallProof. (*Id*. at 138-41.) She states she would on average see her first agent at 10:00am. (*Id.* at 144.) She reports that Wakefield did ask her about the timing of her calls, but that he never told her that 10:00am was a problem. (*Id.* at 144-45.)

On January 15, 2019, at Wakefield's recommendation, Prior was terminated. (SOF ¶¶ 40-41.) The decision to terminate was made by CEO Eddie Cheskis, Vice President, Sales Dawson Robbins, and COO Robert Vaca. (*Id.* ¶ 41.) Perillo was not involved in the decision.[2] (*Id.*) Plaintiff was surprised by her termination and testified that Wakefield refused to give her an explanation for the termination, only stating that it was coming from "higher up" and there was no discussion to be had. (Pl. Dep. Tr. at 166.) Plaintiff also states that she sought an explanation from Christiansen, who provided no further information. (Pl. Dep. at 169-70.) On April 22, 2019, Glass America hired a female employee, Gina Sacharewitz, to replace Prior. (SOF. ¶ 43.)

### E.    Procedural History

On May 14, 2021, Plaintiff filed her Complaint in Connecticut Superior Court (Notice of Removal [Doc. # 1] at 1), which Defendant removed to federal court pursuant to 28 U.S.C. §§ 1332 based on diversity jurisdiction, as Plaintiff is a Connecticut citizen (Compl. ¶ 1) and Defendant is a limited liability company with no members with Connecticut citizenship.[3]

---

[2] While Plaintiff admits in response to Defendant's Statement of Facts that "Perillo had nothing to do with" her termination, she maintains that Perillo provided performance feedback to Wakefield that may have influenced the termination. *See* (Pl.'s SOF Resp. ¶ 41.)

[3] "The sole member of Glass America is Glass America LLC. The sole member of Glass America LLC is Gerber Glass, LLC. The sole member of Gerber Glass, LLC is Gerber Glass Holdings Inc. Gerber Glass Holdings Inc. is a Delaware corporation with its principal place of business in Illinois." (Notice of Removal at 2.)

## II.        Legal Standard

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 71–72 (2d Cir. 2016). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016). In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 175 (2d Cir. 1995). Where "reasonable minds could differ as to the import of the evidence," the question must be left to the finder of fact. *Cortes v. MTA N.Y. City Transit*, 802 F.3d 226, 230 (2d Cir. 2015). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013).[4]

## III.       Discussion

### A.        CFEPA Hostile Work Environment Claim

To establish a hostile work environment, Prior must show that "(1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to

---

[4] Unless otherwise indicated, internal citations, quotation marks, and other alterations are omitted throughout in text quoted from court decisions.

alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996). Glass America argues that this count must be dismissed because "(1) Prior was not subjected to severe or pervasive sexual harassment sufficient to alter the conditions of her working environment; and (2) in the alternative, Glass America cannot be liable for alleged harassment by Prior's non-supervisory co-worker because it provided a reasonable avenue for complaint and it took appropriate remedial action as soon as Prior complained." (Def.'s Mem. [Doc. # 37] at 8-9.)[5]

"[W]hen the harassment is attributable to a co-worker, rather than a supervisor . . . the employer will be held liable only for its own negligence." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998). The Supreme Court has held "that an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim*." Vance v. Ball State Univ.*, 570 U.S. 421, 450 (2013). The Connecticut Appellate Court has affirmed that the *Vance* definition should apply to CFEPA. *O'Reggio v. Commission on Human Rights & Opportunities*, 219 Conn. App. 1, 8 (2023) ("In sum, we conclude that the *Vance* definition of supervisor as used by the courts in Title VII cases is the appropriate definition for distinguishing between the coworker and supervisor theories of liability for hostile work environment claims brought under CFEPA."). This accords with the Second Circuit's conclusion. *See Bentley v. AutoZoners*, LLC, 935 F.3d 76, 91 (2d Cir. 2019) (applying the *Vance* definition to the CFEPA and holding that "an employee is a supervisor only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a significant change in

---

[5] Because the Court finds that Glass America cannot be liable because Perillo was a non-supervisor and Plaintiff admits that Defendant took appropriate remedial action, the Court does not reach the issue of whether Perillo's conduct was severe or pervasive.

employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") (*quoting Vance*, 570 U.S. at 431).

Plaintiff admits that "Perillo had no authority to take any tangible employment actions against her or to effect any change in her employment status, such as hiring, firing, failing to promote reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (Pl.'s SOF Resp. ¶ 20.) As such, in light of Plaintiff's factual concession as to Perillo's role, Perillo cannot be a "supervisor" for purposes of imputing CFEPA liability to Glass America.[6]

Because this claim concerns conduct by a non-supervisory employee, Glass America can be liable if Prior "can demonstrate that the company either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Distasio*, 157 F.3d at 63. Defendant maintains that the facts show Glass America did provide a reasonable avenue for Prior's complaint. It points to the Employee Handbook's reporting protocol for employees who suffer harassment (Def.'s Ex. 4 at 3 § 2.5.4), which Prior received and read (Def.'s Ex. 5 at 43, 45.) Indeed, Prior eventually did report Perillo's harassment to Human Resources. (Def.'s Ex. 7.)[7] These undisputed facts show that Glass America offered a reasonable avenue for an employee complaint. *See Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir. 2009) (holding that "no reasonable jury could conclude that defendants failed to provide

---

[6] Nor does Plaintiff maintain she was under the mistaken belief that Perillo was authorized to take such tangible employment actions against her.

[7] Plaintiff claims Glass America's negligence is shown by the fact that Perillo has not undergone sexual harassment training, despite Connecticut having mandated the completion of such training within one year after October 1, 2019. (Pl.'s Opp'n at 14-15.) Such an argument is irrelevant to the issue of whether there was negligence during her employment, which ended on January 15, 2019. (Pl.'s SOF Resp. ¶ 40.)

Duch with a reasonable avenue of complaint," where they "provided numerous alternative avenues of complaint that Duch could, and eventually did, pursue.")

Nor can Prior show that Glass America "did nothing about" the complaint. Following Prior's report on Friday December 14, 2018, HR Manager Christiansen began an investigation immediately, calling Prior the same day. She spoke with Prior the following Monday and confirmed Prior was not scheduled to work with Perillo that week. On December 18, Christiansen spoke with Perillo and told him not to work with Prior anymore. She informed Prior on December 18 that Perillo was not going to have any contact with her going forward, and if he contacted her, she should inform HR. Following her report, Prior never saw spoke with or communicated with Perillo again in anyway, and Prior admits she was "happy with Glass America's resolution of her complaint." (Pl.'s SOF Resp. ¶ 32.) On these facts, it is evident that Glass America's handling of Prior's complaint does not present a disputed factual issue for trial and summary judgment is granted on Count I.

### B.    Quid Pro Quo Sexual Harassment

Count II alleges quid pro quo sexual harassment in violation of CFEPA. (Compl. ¶ 4.) Plaintiff argues that her rejection of Perillo's sexual advances was a motivating factor in her termination. (*Id.* ¶¶ 45-47). "In order to establish a quid pro quo harassment claim, the plaintiff must make a showing of a causal relationship between the refusal of a *supervisor's* sexual advances and an adverse employment decision." *Garris v. Dep't of Corr.*, 170 F. Supp. 2d 182, 188 (D. Conn. 2001) (emphasis added). It is undisputed that Perillo was not Prior's supervisor under the relevant definition, *see Miro v. City of Bridgeport*, No. 3:20CV00346(SALM), 2022 WL 3284400, at *6 (D. Conn. Aug. 11, 2022) (applying the *Vance* definition of supervisor in the context of a CFEPA claim for quid pro quo sexual harassment), and thus the requisite causal relationship cannot be shown and summary judgment is granted on Count II.

**C.      Retaliation**

Plaintiff's Count III alleges retaliation in violation of CFEPA, arguing that Plaintiff was terminated in retaliation for reporting sexual harassment. (Compl. ¶ 5.). The *McDonnell Douglas* burden-shifting framework applies to Prior's retaliation claim. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552, 556 (2d Cir. 2010) (applying the burden-shifting framework to retaliation claims under both Title VII and the CFEPA); *see also Marini v. Costco Wholesale Corp.*, 64 F. Supp. 3d 317, 332 (D. Conn. 2014) ("CFEPA retaliation claims are analyzed under the same burden-shifting framework established for Title VII cases."). "In order to establish a prima facie case of retaliation, [a plaintiff] must show (1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor*, 609 F.3d at 552.

"At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action. If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a substantial reason for the adverse employment action." *Id.* at 552-53.

Plaintiff's reporting sexual harassment to her employer, the absence of complaints about her performance, and the fact that she was terminated one month after she made her complaint, are sufficient to satisfy the low threshold for prima facie proof.

"A plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir.

2010). While the Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation [it has] previously held that five months is not too long to find the causal relationship." *Id.* Plaintiff's termination roughly one month after making her report is sufficiently temporally proximate to demonstrate a prima facie case of retaliation. *See, e.g.*, *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) ("The three-week period from Kwan's complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity.").

In response, Defendant articulates its claim of a legitimate, non-discriminatory reason for Prior's termination as poor performance. Defendant points to Wakefield's declaration that Prior failed to work the hours she was assigned or to make sales calls when she was supposed to, and that Prior failed to improve when Wakefield sought to address those deficiencies. Prior shoulders her burden of showing pretext by testifying that she received no negative performance reviews from Wakefield, was only ever given positive work feedback, and that Wakefield never communicated that he had any concerns with the number of calls she made or the hours she was working.[8] (Pl. Dep. Tr. at 30-31, 138, 141-43, 166-68). She also claims unwarranted and irregular deviation from the company's "normal disciplinary process" of progressive steps: first a verbal warning, then a written warning, then an unpaid suspension or termination. (Employee Handbook, "Disciplinary Policy".)

Defendant does not offer an explanation for its deviation from the progressive disciplinary process described in the Employee Handbook, including why Plaintiff's conduct constituted circumstances warranting such immediate action. Plaintiff maintains that such

---

[8] Plaintiff does admit that Wakefield communicated to her that she should be making "13 to 15" calls per day, but denies he ever gave any negative feedback as to her job performance. (Pl. Dep. at 138, 147, 167). She testified that she was never given "any disciplinary action or warning or anything like that." (*Id*. at 169.)

deviations from even non-mandatory disciplinary policies can be evidence of pretext. *See Machinchick v PB Power, Inc.*, 398 F.3d 345, 351 (5th Cir. 2005), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) ("Although PB Power correctly notes that its policy is not mandatory, and that Machinchick was an at-will employee, these facts do not eliminate the inference of pretext raised by its failure to follow an internal company policy specifically stating that it should be 'followed in most circumstances.'") Defendant seeks to distinguish *Mahinchick* by noting that its policy does not state the progressive disciplinary policy applies in "most cases," and in fact expressly states that Glass America "may end the employment relationship at any time with or without a reason." (*See* Def.s' Reply [Doc. # 42] at 7.) In *Almodovar v. Cross Fin. Corp.*, No. 3:20-CV-01179 (JCH), 2022 WL 1810132, at *7 n. 11 (D. Conn. June 2, 2022), the district court distinguished *Machinchick* on the grounds that the policy at issue was explicitly optional and held that "simply deviating from company policy – absent anything more – is not enough" to establish pretext for discrimination. *Id.* at *7.

"The Second Circuit has been clear that, while it is true that departures from procedural regularity can raise a question as to the good faith of the process, a plaintiff must show more than mere deviation to survive summary judgment." *Id.* (citing *Bickerstaff v. Vassar College*, 196 F.3d 435, 453 (2d Cir. 1999)). Here, Plaintiff's evidence is not of a "mere" deviation from the "normal" disciplinary policy, but of abandonment of any semblance of "progressive discipline" without basis or notice a month after her complaint. In *Rodrigues v. Connecticut Container Corp.*, defendant's motion for summary judgment was denied where there was strong temporal proximity in conjunction with other evidence of pretext including defendant's "deviation from its standard termination practices." No. 3:20-CV-00294(JCH), 2022 WL 844610, at *6 (D. Conn. Mar. 22, 2022).

Plaintiff testified that Perillo had been significantly involved in reporting on her performance to Wakefield and, when she refused his advances, he alluded to his potentially

providing negative performance reviews about Plaintiff as a consequence. Furthermore, Plaintiff's testimony is that she received no warnings from Wakefield about alleged poor performance, was telephonically fired without any semblance of the "normal" progressive disciplinary process, and "performance" was never articulated as the non-retaliatory reason for her firing until it was asserted as a defense in this litigation. While the Employee Handbook states that the progressive disciplinary policy is not required to be followed in all instances, a fact finder may still infer pretext from Defendant's decision to fire her one month after her sex harassment complaint and forgo its progressive disciplinary policy, particularly where Prior was not claimed to have committed any type of serious misconduct warranting immediate termination. Resolving all ambiguities and drawing all inferences in favor of the Plaintiff, the Court concludes that a jury could reasonably infer that the performance-based reasons proffered by Defendant for firing Plaintiff were pretextual and, given the timing and surrounding circumstances, retaliation against Plaintiff for her complaint against Perillo was the real reason. As such, summary judgment on Count III is not warranted.

### D.    Gender Discrimination Claims

Plaintiff's Count IV alleges gender discrimination in violation of CFEPA, alleging that she was terminated because of her gender. The *McDonnell Douglas* burden-shifting framework governs Prior's gender discrimination claim. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see also Kaytor*, 609 F.3d at 556 ("The analysis of discrimination . . . claims under CFEPA is the same as under Title VII."). To establish a prima facie case, Plaintiff must show that (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Weinstock*, 224 F.3d at 42. Glass must then proffer a legitimate, non-discriminatory reason for the adverse action. *Id.* Prior must then produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons

13

proffered by [Glass America] were false, and that more likely than not [gender discrimination] was the real reason for" the adverse action. *Id*.

Defendant argues Prior cannot establish a prima facie case because there is no evidence showing "circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive" for her termination. *McLee v. Chrysler Corp*., 109 F.3d 130, 135 (2d Cir. 1997). They also note that Prior was replaced by another woman, (SOF ¶ 43) "which weighs heavily against any inference that her termination occurred because of gender discrimination*." Deabes v. Gen. Nutrition Corp*., No. 3:08 CV 372, 2010 WL 1331111, at *3 (D. Conn. Mar. 31, 2010) (granting defendant's motion for summary judgment where plaintiff alleged gender and national origin discrimination as the reason she was fired after a dispute over whether she failed to comply with her company's vacation time policy, and the Court found plaintiff "proffered no evidence raising an inference that gender discrimination motivated her termination"), *aff'd*, 415 F. App'x 334 (2d Cir. 2011).

Plaintiff argues that evidence of harassment is sufficient to give rise to an inference of discrimination, (Pl.'s Opp'n at 20-21), but does not address her own admission that Perillo had "nothing to do with" the termination decision. (Pl.'s SOF Resp. ¶ 41.) Defendant's position is that as a matter of law, harassment or bias by employees who did not make the termination decision "provide[s] no basis for imputing to [the decision-maker] an invidious motivation for the discharge." *McLee*, 109 F.3d at 137*; see also Sanderson v. N.Y. State Elec. & Gas Corp*., 560 F. App'x 88, 93 (2d Cir. 2014) (summary order) (affirming summary judgment on discriminatory termination claim because "Sanderson offers no evidence to suggest that the individuals who harassed her on the day shift played any role in the decision to terminate her employment.") Because the record fails to support that gender discrimination played a role in the decision to terminate Plaintiff, summary judgment is granted as to Count IV.

14

**IV.     Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED with respect to Count I (Hostile Work Environment), Count II (Quid Pro Quo Sexual Harassment) and Count IV (Gender Discrimination), and DENIED with respect to Count III (Retaliation).

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 24th day of August, 2023

15